KELLY, Circuit Judge,
concurring in part and dissenting in part.
While I concur in the court’s opinion to the extent it affirms the district court’s denial of habeas relief, I dissent from reversal and remand of Mr. Battenfield’s ineffective assistance of counsel claim. In my view, the court’s resolution of this claim does not comport with either the proper standard of review or the principles governing ineffectiveness claims.
On collateral review, we may only grant relief if the state court’s adjudication of a federal claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” 28 U.S.C. § 2254(d)(1), or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” § 2254(d)(2). State court factual findings are presumed correct, and one seeking federal habeas relief “shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.” § 2254(e)(1).
Ineffective assistance of counsel requires a petitioner to demonstrate deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As mixed questions of law and fact, we do not afford a presumption of correctness to State court determinations on these issues. Herrera v. Lemaster, 225 F.3d 1176, 1178-79 (10th Cir.2000). However, we do accord a presumption of correctness to state court findings of historical fact underlying these issues. Brecheen v. Reynolds, 41 F.3d 1343, 1366 (10th Cir.1994). Moreover, merely because we may have come to a different resolution on the same facts does not warrant habeas relief. An unreasonable application of federal law means something beyond what we may perceive in our independent judgment as an erroneous or incorrect application of clearly established federal law. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000).
In deciding that the Oklahoma Court of Criminal Appeals (“OCCA”) unreasonably applied Strickland, the court determines that Mr. Battenfield has proven that his trial counsel, Mr. Shook, rendered deficient performance because he failed to adequately investigate potential mitigation evidence in the second stage of the trial. According to the court, this “hampered” Mr. Shook’s ability to make strategic choices about the penalty phase and to competently advise his client. This incompetent advice, coupled with the trial court’s inadequate inquiry into Mr. Battenfield’s decision to forego mitigating evidence, resulted in a waiver that was neither knowing nor voluntary.
The claim in this case is merely a vehicle to correct an error in judgment by Mr. Battenfield, specifically his decision to waive his right to present mitigating evidence. The proper, and properly limited, function of a federal habeas court in this context is to insure that the death penalty is not imposed in violation of the Constitution. Herrera v. Collins, 506 U.S. 390, 400-01, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). If Mr. Battenfield made a knowing and intelligent waiver of his right to present mitigation evidence, then his counsel cannot have been ineffective for failing to develop such evidence. See Wallace v. Ward, 191 F.3d 1235, 1247-48 (10th Cir.1999).
The failure to present mitigating evidence is not per se ineffective assistance of counsel. Brecheen, 41 F.3d at 1368. The reason why no mitigating evidence was presented matters greatly. Id. Here, the OCCA affirmed the state post-conviction trial court’s express determinations, made after an evidentiary hearing, that Mr. Bat-tenfield knowingly and intelligently waived *1237 that right. Battenfield v. State, 953 P.2d 1123, 1127 (Okla.Crim.App.1998), aff’g Battenfield v. State, No. CF-84-73, Findings of Fact and Conclusions of Law and Order Denying Post-Conviction Relief at 6 (Wagoner County Dist. Ct. May 13, 1997) (“It was the opinion of the trial Court that the petitioner knowingly waived his right to present mitigating evidence and this Court agrees.”). Though this court reweighs the evidence and comes to a different conclusion, the record evidence fully supports the state courts’ determination on this point.
Mr. Shook testified that he had “numerous conversations [with Mr. Battenfield] about the possibility of having a second stage,” and that most of those conversations took place prior to trial. Hr’g Tr. at 2:115-16. He also testified that, having previously discussed second-stage proceedings with Mr. Battenfield, Mr. Batten-field’s decision at trial happened completely without warning. Id. at 134. It is uncontroverted that Mr. Shook advised Mr. Battenfield to present mitigating evidence and that Mr. Battenfield declined Mr. Shook’s advice. Trial Tr. at 1421; Hr’g Tr. at 2:117-18. Mr. Battenfield not only declined to testify on his own behalf, but also to put on any other mitigating evidence (“my parents and stuff’). Trial Tr. at 1421-22; Hr’g Tr. at 2:117-18. This was not for want of adequate investigation or lack of a second-stage strategy by Mr. Shook, or improper safeguards by the state district court on waiver. Rather, it was due to Mr. Battenfield’s conscious choice.
By affidavit and testimony, Mr. Shook indicated that Mr. Battenfield was angry about the outcome of the first stage.
Mr. Battenfield waived his right to testify and did not want me to put his parents on the stand. If I had been permitted to present his parents, I would have had them testify as to his good eharac-ter[ ]. His decision to waive mitigation occurred immediately after the jury found him guilty. He was angry, upset, depressed, and stated that the jury could do whatever they wanted. Basically, he just gave up.
Shook Aff. at 1-2. Although Mr. Shook felt that Mr. Battenfield “was not in a condition to knowingly waive this vital stage of the trial,” Mr. Shook followed the wishes of his client:
When Mr. Battenfield told me he did not want to put any mitigation on in the second stage, I was not expecting it. I had never encountered a situation such as this, and was not sure of what action to take. I followed Mr. Battenfield’s wishes even though I knew it was the wrong action to take. If I knew that I could have continued with the second stage as I had planned despite Mr. Bat-tenfield’s attitude, I would have done so.
Id. at 2; accord Hr’g Tr. at 2:116-17.
The state courts could certainly reject Mr. Battenfield’s post-conviction assertion that Mr. Shook never explained “the importance of mitigation or ... what mitigation actually is.” Battenfield Aff. ¶ 2. They could instead decide that the testimony of Mr. Shook and the original trial judge to the contrary was more credible. E.g., Hr’g Tr. at 1:116, 119-20; see also id. at 2:120 (direct examination of Mr. Shook) (Q: “Had you explained to the defendant the meaning of mitigating evidence and what you intended to present? A: Yes.”). Despite a vigorous cross-examination at the state post-conviction hearing, the trial judge was steadfast in his belief (then and at the hearing) that Mr. Shook had discussed mitigation with his client. Id. at 1:116. He based this belief upon his visits with Mr. Shook, the request by the defense to make a record on the issue, and the furnishing of the bill of particulars to the defense. Id. The fact that the OCCA would later issue guidelines governing the waiver of the right to put on mitigating evidence should not cause us to disregard the careful inquiry at the state post-conviction evidentiary hearing. Cf. Wallace v. State, 893 P.2d 504, 512 (Okla.Crim.App. 1995).
Plainly, the reasonableness of Mr. Shook’s actions must be judged against the firm desires of his client. See Strickland, *1238 466 U.S. at 691, 104 S.Ct. 2052. We have held that a defendant may waive the right to put on mitigating evidence. Wallace, 191 F.3d at 1247-48. There is little reason to believe that Mr. Battenfield would have allowed the presentation of mitigating evidence at his trial, even if that evidence came from sources other than himself or his parents. Mr. Battenfield’s expert testified that while defense counsel cannot compel a defendant to testify in the second stage, counsel that does not present mitigating evidence, even over the objection of his client, renders deficient performance. Hr’g Tr. at 1:22, 36. This is directly at odds with the client’s right to participate in his own defense, let alone Strickland. See Smith v. Massey, 235 F.3d 1259 (10th Cir.2000) (“Although the legal expert who testified on behalf of Smith in her post-conviction proceedings testified that [Smith’s trial attorney] should have pursued the ‘architect’ or ‘manipulation’ theory notwithstanding Smith’s wishes, this testimony is clearly inconsistent with the Supreme Court’s view of the attorney-client relationship.”).
The premise of the court’s decision, that Mr. Shook lacked an adequate mitigation strategy due to an inadequate investigation also is not supported. Mr. Shook testified that he visited with Mr. Battenfield’s parents at court appearances and in his office, though he could not recall how many times, and that he conversed with them about the purpose of their potential second-stage testimony. Hr’g Tr. at 2:138. He was aware of Mr. Battenfield’s troubled life, including his problems with substance abuse and his association with the “wrong crowd.” Id. at 2:131, 135. He further testified that he intended to call Mr. Battenfield’s parents and perhaps a sibling, as witnesses and that he had conversed with his client regarding the presentation of such evidence. Id. at 2:115. He intended to describe Mr. Battenfield’s background, to bring out the positive aspects of his life, and to have his parents ask the jury not to impose the death penalty. Id. at 2:118-19, 138-39. This was a permissible trial strategy to which a reviewing court owes deference, notwithstanding that there may have been other ways to defend the case. See Strickland, 466 U.S. at 689-90, 104 S.Ct. 2052; Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir.2000) (mitigation evidence serves to humanize and explain the defendant).
The mitigating evidence that the court views as significant is contained primarily in a social worker’s assessment of Mr. Battenfield. It includes a double hearsay account of the circumstances of Mr. Bat-tenfield’s 1978 conviction, perhaps related by Mr. Battenfield himself. St. Peter Aff. ¶ 17 (“[Mr. Battenfield] states that all of this occurred while in a blackout so he only has others’ descriptions to rely on as to what actually occurred.”). The evidence of alcohol dependence came from a four-hour evaluation of Mr. Battenfield by a clinical psychologist. Hr’g Tr. at 2:48; Murphy Aff. at 2 (“His personality testing found that Mr. Battenfield suffers exclusively from alcohol dependence.”). This court concludes that the “continuing threat” ag-gravator could have been mitigated with evidence that Mr. Battenfield would not have had access to alcohol in prison, that he may have been amenable to treatment, or that his alcoholism may have worsened as a result of a car accident occurring some eight years prior to the assault and battery conviction. Ct. Op. at 1235; see also Boyd v.. Ward, 179 F.3d 904, 918 (10th Cir.1999) (available mitigating evidence must be viewed against the strength of the State’s case and the aggravators actually found), cert, denied, 509 U.S. 908 (2000). All of this is nothing more than speculation; the evidence about alcoholism just as easily could have had an unintended and negative effect upon the jury.
Regardless, the OCCA was unassailably correct in concluding that the substance of the mitigating evidence (which is largely historical data) could have been presented by Mr. Battenfield and his family, particularly his parents, had he heeded the advice of counsel. Battenfield, 953 P.2d at 1127. Had Mr. Battenfield cooperated with Mr. *1239 Shook’s second-stage strategy, evidence that he “was known for his compassion, gentleness, and lack of violence even when provoked,” St. Peter Aff. ¶ 17, surely would have been brought out, even without an extensive investigation.
In sum, the court’s decision is at odds with our current standard of review and with Strickland. Mr. Battenfield rejected the assistance his counsel offered. Moreover, the actions that counsel took prior to the waiver were reasonable under the circumstances. I respectfully dissent from this portion of the court’s opinion and would affirm the district court’s denial of the writ.[1]

. Mr. Battenfield also argues that the evidence is insufficient to sustain the death penalty because the OCCA, in upholding the continuing threat aggravator, relied upon the 1978 conviction (for assault and battery with a dangerous weapon after former conviction of a felony), which the jury apparently rejected as a basis for a continuing threat aggravator. See Battenfield. v. State, 816 P.2d 555, 566, reh'g denied, 826 P.2d 612, 613-14 (Okla.Crim.App.1991). The jury’s rejection of the continuing threat aggravator described in the State’s bill of particulars, however, cannot be viewed as a factual rejection of the 1978 conviction because the bill of particulars misdes-cribed the 1978 offense. See Battenfield, 826 P.2d at 613. Mr. Battenfield’s reliance on Presnell v. Georgia, 439 U.S. 14, 16-17, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978) (an appellate court may not uphold a death sentence upon aggravating factor or circumstance not before the jury), is completely unconvincing. Here, the continuing threat aggravator was contained in the bill of particulars and both the jury and the OCCA were entitled to consider the 1978 conviction in connection with it.